IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

COMMSOLVERS LLC, and
MITEL CLOUD SERVICES, INC.,

      Plaintiffs and Counterclaim
      Defendants,

v.                            Case No. 3:21-CV-01234-NJR

WIELAND NORTH AMERICA, INC.,

      Defendant and Counterclaim
      Plaintiff.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This case arises out of a contract dispute involving three businesses. Plaintiffs and Counterclaim Defendants Commsolvers LLC ("CommSolvers") and Mitel Cloud Services, Inc. ("Mitel") (collectively "Plaintiffs") allege that they entered into binding contracts with Defendant and Counterclaim Plaintiff Wieland North America, Inc. ("Wieland"). Wieland has repudiated these contracts on the basis that the employee who signed them on its behalf had no authority to do so. CommSolvers brings four claims against Wieland: breach of contract (Count I); unjust enrichment (Count II); quantum meruit (Count III); and promissory estoppel (Count IV). (Doc. 31). Mitel advances five claims against Wieland: breach of contract (Count I); declaratory judgment (Count II); promissory estoppel (Count III); unjust enrichment (Count IV); and quantum meruit (Count V). (Doc. 32). Wieland, for its part, has asserted a counterclaim against CommSolvers for violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.[1] (Doc. 45). Wieland and CommSolvers have moved

---

[1] Wieland voluntarily dismissed its counterclaim for misappropriation of trade secrets (Counterclaim I) against CommSolvers and Mitel. (Doc. 45); *see also* (Doc. 88) (July 22, 2024 dismissal order).

for summary judgment as to all claims against them. (Docs. 77 & 79). The court held a hearing on October 9, 2024 (*see* Doc. 113).

Before turning to the merits, the Court offers a general observation about the factual record in this case. Local Rule 56.1 requires the moving party to file a Statement of Material Facts in support of its motion for summary judgment. S.D. Ill. R. 56.1(a). The rule also permits the opposing party to submit a Statement of Additional Material Facts if necessary to complete the factual record. *Id.* § (c). This process helps facilitate "the efficient and economical resolution of summary judgment motions." *Widdows v. Jackson Cnty.*, No. 3:22-CV-00200-NJR, 2024 WL 3636664, at *5 (S.D. Ill. Aug. 2, 2024). The focus of a Local Rule 56.1 statement is on the facts, not the parties' legal advocacy. *See Hinterberger v. City of Indianapolis*, 966 F.3d 523, 527 (7th Cir. 2020) (local rules "require the parties to submit *factual statements* to assist with identifying and isolating the disputed from the undisputed") (emphasis added). Here, all parties—to varying degrees—infused their Local Rule 56.1 statements with unnecessary adjectives and their own narratives of the case. Unsurprisingly, this drew significant objections from the opponent and created a record with many more factual disputes than necessary. The Statements of Material and Additional Material Facts are intended to accomplish a simple goal: "to alert the court to precisely what factual questions are in dispute and point the court to the specific evidence in the record that supports a party's position on each of these questions." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994). By turning their Local Rule 56.1 statements into an extension of their legal briefs and needlessly editorializing the relevant "facts," the parties made the Court's job of identifying admitted and disputed material facts unnecessarily difficult.

BACKGROUND

CommSolvers is a telecommunications consulting firm that negotiates lower cost
telecommunications services with vendors on behalf of its clients. CommSolvers Statement
of Material Facts ("SOF") ¶ 1 (Doc. 80). Mitel is a "manufacturer of telecommunications
equipment whose products include phones, servers, conferencing units, communication
software, cloud-based services, contact center solutions, and messaging systems." Mitel Am.
Compl. (Doc. 32 at ¶ 11). Wieland is a global metals manufacturer focused on copper, copper
alloys, steel, titanium, and aluminum. CommSolvers SOF ¶ 2.

From November 2017 until July 16, 2021, Scott Schuetz ("Schuetz") was an employee
in Wieland's IT department. Wieland SOF ¶ 1 (Doc. 78-1). At some point between March and
August of 2020, Schuetz approached CommSolvers to discuss an upgrade to Wieland's
telecommunications systems. *Id.* ¶¶ 4-5; Mitel SOF ¶ 84 (Doc. 90). Schuetz and others at
Wieland believed that the company needed to switch from an analog telecommunications
system to a cloud-based system. *Id.* ¶ 93; Wieland Resp. to Mitel SOF ¶ 93 (Doc. 98-1).

Schuetz had known CommSolvers' president Stephen Burian for several years.
Wieland SOF ¶ 5. Burian also knew Schuetz's father, Art Schuetz ("Art"), with whom Burian
had a prior working relationship. *Id.* ¶ 6. Burian learned from conversations with Art that
Schuetz was a "decisionmaker" at Wieland. *Id.* ¶ 7. In his communications with Plaintiffs,
Schuetz represented his professional titles as "Network Operations Mgr - Wieland Digital
Solutions," "IT - Director of Operations," "IT Operations Director – North America,"
"Director - IT Operations," and "Systems Administrator/Engineer." *Id.* ¶¶ 12, 14.

CommSolvers assigned Bart McCrory to assist Wieland in finding a solution for its
telecommunications needs. Mitel SOF ¶ 87. McCrory brought a company called RJR

Communications LLC ("RJR") into the process to assist. Mitel SOF ¶¶ 88-89. RJR was Mitel's sales partner in the channel distribution of Mitel products and services. *Id.* At the time, Wieland was already using Mitel analog telephones through another Mitel subagent called CMS Communications. Wieland SOF ¶ 9; Mitel SOF ¶ 92. CommSolvers and RJR identified potential telecommunications providers, including Mitel and another company called 8 x 8 (pronounced "eight by eight"). *Id.* ¶ 95.

It is unclear whether Schuetz communicated with Plaintiffs "on his own initiative" or at the behest of his superiors at Wieland. Wieland SOF ¶ 16; CommSolvers' Resp. to Wieland SOF ¶ 16 (Doc. 91); Wieland SOF ¶ 16. Schuetz's boss, Roman Scholz, was aware of his communications with Plaintiffs and told him to "keep plugging away." CommSolvers' Resp. to Wieland SOF ¶ 16. Schuetz also testified that another one of his supervisors, Sam Gervich, told him: "don't bring me problems, bring me solutions." CommSolvers Statement of Additional Material Facts ¶ 18 (Doc. 92).

It is also disputed whether Schuetz spoke to others at Wieland about contracting with Mitel and CommSolvers. Schuetz testified that he did not "talk to Roman [Scholz] about any telephone pricing," and "didn't look at any type of document or anything like that" with Scholz. Wieland SOF ¶¶ 17, 18. Keith Martin, another Wieland employee, indicated that there were no "conversations or communications or contacts with Schuetz" inside Wieland "about CommSolvers or Mitel" until July 2021. *Id.* ¶ 19. But Schuetz testified that he spoke to Scholz about telecommunications issues at Wieland and about CommSolvers in particular when Scholz visited Wieland's facility in East Alton, Illinois, in January 2021. CommSolvers' Resp. to Wieland SOF ¶¶ 17, 18. According to Schuetz, Scholz "knew that everything was out of date also knew our communications looked like shit." *Id.* ¶ 17.

At some point, in 2020, Scholz spoke to James McGarry, a Mitel employee, about an "engagement" that "evolved into the Mitel Service Order" in 2020. Mitel Resp. to Wieland SOF ¶ 23. In McGarry's words, he "needed Roman to support an engagement to make sure that we could—that we knew this would be an opportunity that we could pursue, that it wasn't—that it was real, right." McGarry Depo. Tr., p. 34, Wieland Ex. 11. He also testified that he sent a "draft contract or proposed contract" "to start scoping it out" before speaking with Roman. *Id.* McGarry "left that call feeling like this is a real project and a real opportunity for us to engage." *Id.*

On December 31, 2020, Schuetz signed a contract for Mitel to upgrade Wieland's telecommunications systems to a cloud-based platform in exchange for monthly payments (the Court will refer to the contract between Wieland and Mitel as the "Mitel Service Order" and will, at times, refer to the project of updating Wieland's telecommunications system as the "Mitel Cloud Project"). Wieland SOF ¶ 21; Mitel SOF ¶ 106. Below his signature, Schuetz added a note: "To extend so Roman can review on or before Jan/8/21." Wieland SOF ¶ 24. On January 8, 2021, Schuetz signed a second version of the Mitel Service Order. *Id.* ¶ 25. The second time he signed the Mitel Service Order, he did so without annotations and noted his authority to sign as "Director – IT Operations." Mitel SOF ¶ 116.

On January 29, 2021, Schuetz told Burian that he "got the CommSolvers contract approved yesterday." CommSolvers Depo Tr., p. 66, Wieland Ex. 7. Schuetz signed the consulting agreement with CommSolvers on May 25, 2021. CommSolvers' Resp. to Wieland SOF ¶ 40. Until that time, CommSolvers "was operating in 'good faith' on behalf of Wieland in the negotiations with Mitel even without a signed agreement." *Id.* The CommSolvers consulting agreement had an effective date of "May 2020." *Id.* ¶ 39.

The fact that Schuetz, and not someone else at Wieland, signed these contracts was consistent with industry practice. RJR's corporate representative, Lisa Solecki, testified that "in IT, we don't require a C-level person. . . . Procurement managers sign our contracts, IT sourcing managers sign our contracts, IT administrator managers and securities sign our contracts. We don't have C-level people signing our contracts." RJR Depo. Tr., p. 64, CommSolvers Ex. 5; Mitel SOF ¶ 83. Also, when CommSolvers and RJR arranged for Schuetz to speak with 8 x 8, no one at 8 x 8 "question[ed] whether Scott Schuetz had authority to negotiate a deal on behalf of Wieland." *Id.*, p. 63. Notably, all parties agree that it is "virtually unheard of" in the IT industry for an employee to enter into a contract on his employer's behalf without proper authority to do so. Mitel SOF ¶ 124; Wieland Resp. to Mitel SOF ¶ 124.

Beginning on January 8, 2021, the same day he signed the second version of the Mitel Service Order, Schuetz sent a series of communications to CommSolvers seeking to cancel the Mitel Service Order. On January 8, Schuetz sent a text message to Tricia Rehkemper of CommSolvers in which he wrote: "Hey if u still got contract I signed last week can you change date to 18th per this email and send it back. Because we will ask Roman to sign real one Thursday." Wieland SOF ¶ 33. On January 18, 2021, Schuetz sent an email to Burian threatening to "issue a cancelation statement Friday to cancel the [Mitel] contract" if "Mitel cant [sic] figure out how to engage thru [sic] a vendor." *Id.* ¶ 34; Wieland Ex. 28. On January 25, 2021, Schuetz followed up with Burian via email:

> [B]elow is what we want to do at this point . . . . Cancel the Mitel contract (30 day out clause with no questions asked) (because we are not going to start on that until after the networking upgrades and it needs to go through legal. I know this will change the price by a lot but we are ok with that). Roman and I feel better about doing the networking stuff first and not having this hanging out since it was rushed in the first place and I don't want my signature out there on it. Also it looks like a lot of pre-work will be between you and CMS as

Mitel was not able to even pull the configs.

Wieland Ex. 29. Then on January 29, 2021, Schuetz sent Burian another email seeking to cancel the Mitel Service Order. Wieland Ex. 30. The January 29 email informed Burian that Wieland was closing two of its offices to "cut costs and social distance" and that these developments were "really going to change the Phone system outlook." *Id.* As a result, Schuetz told Burian that Wieland "must exercise the 30 day out no questions asked clause" because "[t]here is no way I feel that we can move forward until the consolidation is done." *Id.* CommSolvers never conveyed Schuetz's request to cancel the Mitel Service Order to Mitel, insisting that it was Wieland's responsibility to do so. CommSolvers' Resp. to Wieland SOF ¶ 37. But Schuetz never invoked the 30-day out-clause with Mitel, thus causing the Mitel Service Order to go "into full effect after 30 days." *Id.*

On or around May 11, 2021, Wieland's Associate General Counsel, Ashley Huber, sent an email to Schuetz approving the CommSolvers consulting agreement "[a]fter the following changes are made." Wieland Ex. 37; Wieland SOF ¶ 42. Schuetz testified that he falsified Attorney Huber's email to him "[b]ecause [he] was told there needed to be proof of Wieland also accepting it." Schuetz Depo. Tr., p. 193, Wieland Ex. 5. Attorney Huber also testified that the email was "forged" and that she "did not write it." Huber Depo Tr., p. 12, Wieland Ex. 38. But Plaintiffs dispute Wieland's characterization of the email as a forgery, noting that Schuetz regularly communicated with Attorney Huber "about legal matters and had worked with her in the past." CommSolvers' Resp. to Wieland SOF ¶ 42; Mitel Resp. to Wieland SOF ¶ 42. Schuetz forwarded Attorney Huber's email to Burian as a JPEG file. Wieland SOF ¶ 45. CommSolvers found it "odd" that the email was sent in that format but understood that Schuetz may not have wanted to forward an email from counsel directly to CommSolvers

because it was subject to the attorney-client privilege. Mitel Resp. to Wieland SOF ¶ 45; CommSolvers' Resp. to Wieland SOF ¶ 45; CommSolvers Depo Tr., p. 73, Wieland Ex. 7.

At some point in 2021, Schuetz shared a Wieland-owned laptop and virtual private network ("VPN") login credentials with CommSolvers. CommSolvers SOF ¶ 27; Wieland Resp. to CommSolvers SOF ¶ 27. According to Burian, Schuetz provided these items "without request or prompting from CommSolvers." Burian Aff. ¶ 13, CommSolvers Ex. A (Doc. 80-1). Burian also states that:

> Schuetz indicated that the Wieland laptop could be used as remote works use at Wieland. Schuetz [also] provided VPN . . . login credentials to CommSolvers. However, at no time did CommSolvers plug in, boot up, or use the Wieland laptop. CommSolvers did not access any information on the Wieland laptop, nor did CommSolvers ever access Wieland's network, whether via the Wieland laptop or otherwise.

*Id.* Schuetz "retrieved" the laptop at some point in the summer of 2021. *Id.* ¶ 14. Wieland does not appear to dispute Burian's declarations on these issues except to insist that they do not support CommSolvers' contention that Schuetz provided the laptop and VPN in connection with the CommSolvers consulting agreement because the agreement may have been signed after the laptop and VPN were provided to CommSolvers. Wieland Resp. to CommSolvers' SOF ¶ 27. Wieland also disputes CommSolvers' claim, based on Burian's affidavit, that it "never logged in to and never accessed the laptop computer or Wieland's network at any time." CommSolvers' SOF ¶ 28. Wieland maintains that "if Schuetz had provided his own VPN log in information to CommSolvers, Wieland would not be able to discern whether CommSolvers used it or not." Wieland Resp. to CommSolvers' SOF ¶ 28. But it is undisputed that Wieland examined its network and found "no breaches of security by CommSolvers or Mitel and no damage to Wieland's computer systems." CommSolvers' SOF ¶ 29.

In July 2021, things began to unravel. On July 14, 2021, Tricia Rehkemper of
CommSolvers sent an email to Keith Martin to "introduce" herself because Schuetz had gone
on leave and the Mitel Cloud Project was not progressing. Wieland Ex. 26. Martin informed
Rehkemper that "Wieland does not have any new system implementations in process at this
time." *Id.* Sarah Watson of Mitel then sent Martin the signed contract between Wieland and
Mitel, dated December 31, 2020, and explained that she was Wieland's "Mitel representative
and lead Manufacturer contact on this engagement." *Id.* After these email exchanges,
Rehkemper sent Watson a text message saying "Keith is shitting himself right now. Is it bad
that I'm enjoying this a little at least we are talking to a person with sense." Wieland SOF
¶ 59. Watson responded: "Me too actually." *Id.*

On July 16, 2021, Wieland terminated Schuetz. *Id.* ¶ 61. One week later, Plaintiffs
spoke with several Wieland stakeholders including Keith Martin (Global IT Manager,
Collaboration), Roman Scholz (Senior Director Global IT Technology & Service), Mark
Fowler (Director, Global IT & Oracle Group), Joseph Stutz (General Counsel), and Ashley
Huber (Associate General Counsel). *Id.* ¶¶ 62-63. On this call, Wieland repudiated the
contracts with CommSolvers and Mitel. *Id.* ¶ 64.

The parties have conflicting views of where the repudiated contracts left them.
Wieland contends that it received no "goods or services" from CommSolvers. Wieland SOF
¶ 67. But CommSolvers insists that it provided "consulting services to Wieland over the
course of more than one year," and devoted at least one million dollars to the Mitel Cloud
Project, which was an "all hands-on deck" effort. CommSolvers Resp. to Wieland SOF ¶ 67.
As for Mitel, its corporate representative, Sarah Watson, acknowledged that "not a single seat
was set up, not a single instance was activated, not a single phone was delivered. Not one

moment of time did Wieland ever use Mitel Cloud Services." Mitel Depo. Tr., p. 97, Wieland Ex. 21. But Mitel insists that it "worked hard" on the Mitel Cloud Project, including by "developing a system for the use of a seven-digit phone extension system, which is atypical and was bespoke particularly for Wieland." Mitel SOF ¶ 125. Watson also testified that Mitel paid its sales staff approximately $250,000 in commissions and that it incurred around $30,000 for time spent on "implementation." Mitel Depo. Tr., p. 78. Mitel has not sought to "claw back" its commission payments to its employees. Wieland SOF ¶ 81. The Mitel Service Order also contained an early termination provision entitling Mitel to over $5,000,000 if the contract was terminated early. Mitel SOF ¶ 114. Wieland admits that Mitel "had done some internal work . . . to prepare for implementation" but insists that it never received anything of value from Mitel. Wieland Resp. to Mitel SOF ¶ 125.

Wieland also maintains that CommSolvers' only out-of-pocket loss in connection with its consulting agreement with Wieland was "less than $10,000" that it paid to Art Schuetz. Wieland SOF ¶ 70. CommSolvers disputes the contention that this was its only out-of-pocket loss because its consulting agreement with Wieland called for "Time and Material/Hourly Fees" to be paid. Commsolvers Resp. to Wieland SOF ¶ 70, CommSolvers Ex. 18 (fee and compensation table).

The CommSolvers consulting contract calls for Wieland to pay it "25% of the difference between initial/current pricing and negotiated pricing on services, equipment, etc." *Id.* The Mitel Service Order had an initial service term of 36 months. CommSolvers Ex. 1, p. 7 (Doc. 92-1). Burian testified on behalf of CommSolvers that he would be "completely speculating what [Wieland's] spend was" before the Mitel Cloud Project because he could not recall the numbers that Schuetz provided verbally. Wieland SOF ¶ 75; CommSolvers

Depo. Tr., p. 82, Wieland Ex. 7. But Scott Peterson, Mitel's former Chief Revenue Officer, testified that Wieland's savings would be expected to be "at least 20 to 30 percent, you know, per user per month." Peterson Depo. Tr., p. 72-73, Mitel Ex. 2. Art Schuetz testified that Wieland has "over 16,000 telephones and [was] paying $29 a month for those numbers." Art Schuetz Depo. Tr., p. 14. Thus, "16,000 times $29 a month" was Wieland's "base rate." *Id.*, p. 15, Mitel Ex. 3. And Wieland's cost under the Mitel Cloud Project, according to Art, would have been "like $16 a month versus $29 a month for the phone service." *Id.*, p. 77. Based on these numbers, CommSolvers estimates that Wieland's savings over 36 months would be $7,488,000 ((16,000 × $29) multiplied by 36 months – (16,000 × $16) multiplied by 36 months), thus entitling CommSolvers to $1,872,000 (25% of Wieland's estimated savings). CommSolvers Resp. to Wieland SOF ¶ 77.

LEGAL STANDARD

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Assertions that a fact cannot be or is genuinely disputed must be supported by materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials. FED. R. CIV. P. 56(c)(1). Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the non-movant. *Bennington v.*

*Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). The Court may not "assess the credibility of witnesses or balance the relative weight of conflicting evidence." *Palmer v. Franz*, 928 F.3d 560, 565 (7th Cir. 2019) (alteration omitted) (quoting *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010)). "The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge*, 24 F.3d at 920.

DISCUSSION

### I.  Wieland's Motion for Summary Judgment

Wieland raises three principal arguments in support of its motion for summary judgment. First, it argues that Schuetz was not authorized to bind Wieland to the contracts at issue, thus rendering them legally invalid. This argument targets CommSolvers' and Mitel's breach of contract and promissory estoppel claims at Counts I and IV of CommSolvers' Amended Complaint and Counts I and III of Mitel's Amended Complaint. Second, Wieland argues that Plaintiffs' quasi-contract claims fail because it never received anything of value from them. This argument targets Counts II and III in CommSolvers' Amended Complaint and Counts II and IV in Mitel's Amended Complaint. Third, Wieland contests CommSolvers' and Mitel's damages claims, arguing that CommSolvers' damages are speculative, and that Mitel cannot recover certain commission payments to its employees because it failed to mitigate these damages. The Court will address Wieland's arguments in that order.

### A.  Plaintiffs' Contract Claims

As Wieland puts it: "This is a case about apparent authority." Wieland contends that the evidence does not support Schuetz's authority to bind it to the Mitel Service Order and the consulting contract with CommSolvers. Plaintiffs, on the other hand, argue that Schuetz

was properly authorized to bind Wieland to the contracts in question, and that, at a minimum, the evidence raises a disputed issue of material fact as to Schuetz's authority. To resolve this question, the Court applies the principles of agency law to determine whether Schuetz had the authority to bind Wieland to the contracts in question. *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000).

Under Illinois law, an agent's authority to bind a principal can be either actual or apparent. *Azuz v. Accucom Corp.*, No. 21-cv-1182, 2023 WL 2525486, at *7 (N.D. Ill. Mar. 15, 2023). "Only the words or conduct of the alleged principal, not the alleged agent, establish actual or apparent authority of an agent." *Opp*, 231 F.3d at 1064 (alterations omitted). "While agency is a legal concept, the existence and scope of an agency relationship is a fact-intensive inquiry reserved for the finder of fact unless the parties' relationship is so clear as to be undisputed." *Arris Grp., Inc. v. CyberPower Sys. (USA), Inc.*, 192 N.E.3d 86, 100 (Ill. App. Ct. 2021) (quoting *McNamee v. Sandore*, 869 N.E.2d 1102, 1115 (Ill. App. Ct. 2007)).

### 1. *Actual Authority*

Actual authority can be either express or implied. "An agent has express authority when the principal explicitly grants the agent the authority to perform a particular act." *C.A.M. Affiliates, Inc. v. First Am. Title Ins. Co.*, 715 N.E.2d 778, 783 (Ill. App. Ct. 1999). Implied actual authority, on the other hand, "'is actual authority that is implied by facts and circumstances and it may be proved by circumstantial evidence.'" *Opp*, 231 F.3d at 1064 (quoting *Wasleff v. Dever*, 550 N.E.2d 1132, 1138 (Ill. App. Ct. 1990)). But it is the principal's words and conduct, not the agent's, that are "crucial to establish actual authority." *Curto v. Illini Manors, Inc.*, 940 N.E.2d 229, 235 (Ill. App. Ct. 2010).

On January 29, 2021, Schuetz sent an email to Burian telling him that he "got the

CommSolvers contract approved yesterday." This statement conveys Schuetz's actual authority to bind Wieland to the contract with CommSolvers because "[c]orporations act through their officers and directors and are bound by their actions when performed within the scope of their authority." *First Chicago v. Industrial Comm'n*, 691 N.E.2d 134, 138 (Ill. App. Ct. 1998). The Illinois Appellate Court recognized this in *Zahl v. Krupa*, where a corporation's president induced the plaintiffs to invest money with him but then failed to return the money at the end of the contractual investment period. 850 N.E.2d 304, 307 (Ill. App. Ct. 2006). The plaintiffs sued the corporation, its officers and directors, and the president. *Id.* The corporation disputed the president's authority to bind it to the investment contract, arguing that its president was acting in his individual capacity. *Id.* at 311-12. The court rejected this argument because, given the president's senior position in the company, "plaintiffs were entitled to consider *his words and conduct* as those of [the corporation] itself where it was reasonable to do so." *Id.* at 312 (emphasis added). Of course, Wieland strenuously argues that Schuetz was a "low level" IT employee with no authority to bind it. But that is a factual question that cannot be resolved in Wieland's favor at the summary judgment stage. What matters is that an employee of Wieland made a representation to a third party that the CommSolvers consulting agreement got "approved." That is evidence of actual authority because "[w]here . . . a corporation is the alleged principal, it must be remembered that a corporation is a legal entity that acts only through persons." *Id.*

The fact that Schuetz, and not someone else at Wieland, conveyed this information does not affect its evidentiary value at the summary judgment stage. "An actual agency relationship is controlled by the express authorization of the principal or implied conduct of the principal *and agent*." *Curto*, 940 N.E.2d at 235 (emphasis added). As noted, any actions

that would bind Wieland to a contract necessarily are carried out by its employees. *See Smith v. Waukegan Park Dist.*, 869 N.E.2d 1093, 1097 (Ill. App. Ct. 2007) ("because a local entity, like a corporation, can act only through its employees, any act of retaliatory discharge would be carried out by an employee.") (internal citation omitted). Whether a jury ultimately believes that Schuetz "got the CommSolvers contract approved" is irrelevant. What matters is that Schuetz's representation to that effect is competent evidence of his actual authority to bind Wieland to the contract with CommSolvers.

Attorney Huber's May 11, 2021 email to Schuetz also plays a critical role here. She expressly approved the consulting agreement between Wieland and CommSolvers "[a]fter the following changes are made." Schuetz then proceeded to sign the agreement in an in-person meeting with CommSolvers. Attorney Huber's email likewise is competent evidence of Schuetz's express actual authority. Wieland argues that Schuetz admitted that he forged Ms. Huber's email and that it consequently cannot be used as evidence to defeat summary judgment. Wieland also insists that the email's format as a JPEG file should have set off CommSolvers' alarm bells that it was not authentic. But these arguments only work if the Court turns the summary judgment standard on its head and views the evidence in Wieland's favor.

The authenticity of an email is a question of fact for a jury to resolve. *See Davis v. Crescent Elec. Co.*, No. 12-5008, 2016 WL 1637309, at *6 (D. S.D. Apr. 21, 2016) (denying motion for sanctions because "[t]he authenticity of and whether or not Davis sent the disputed reply email would be for the jury to decide"). Here, the authenticity of Attorney Huber's email is not disputed on the basis that CommSolvers fabricated it; the fabrication—if any—was done by Schuetz, a Wieland employee. And although Schuetz has since disavowed the authenticity

of the email, he initially presented it to CommSolvers as authentic, thus raising a triable issue as to whether he was being truthful then or when he was deposed in connection with this litigation. And although Burian admitted that he found it "odd" that Schuetz sent him Attorney Huber's email in a JPEG format, he attributed Schuetz's decision to do so to his desire to protect the attorney-client privilege. A jury could believe Burian on this point and find that it was reasonable for him not to investigate the email's authenticity further. *See Zahl*, 850 N.E.2d at 314 (whether plaintiffs failed to exercise "due prudence" in contract formation was question of fact); *cf. Grassi v. Grassi*, No. 20-3358, 2021 WL 3355475, at *7 (6th Cir. 2021) (whether signature on contract was forged was question of fact).[2]

At this stage, CommSolvers is entitled to a favorable inference of Schuetz's actual authority based on Schuetz's own representation to Burian that he "got the CommSolvers contract approved" and Attorney Huber's email. Wieland, of course, has evidentiary ammunition to contest the authenticity of Attorney Huber's email and to impeach Schuetz's credibility as a witness. Indeed, Schuetz's claim that he "got the CommSolvers contract approved" is refuted by his own testimony that he did *not* obtain express approval from his superiors to enter into the contracts in question. If and when Wieland presents this evidence, a jury may be persuaded that Schuetz did not have actual authority to bind Wieland to the contract with CommSolvers. All that matters for now is that the evidence is equivocal as to Schuetz's actual authority to bind Wieland. *See Palmer*, 928 F.3d at 565 (court may not "balance the relative weight of conflicting evidence" at summary judgment stage).

---

[2] Wieland asked the Court to sanction CommSolvers under Rule 11 for relying on Attorney Huber's email as summary judgment evidence, notwithstanding Schuetz's repudiation of its authenticity. (Doc. 107). In its response, CommSolvers pointed out that Wieland had sued Schuetz in Kentucky state court but dismissed that case in favor of this litigation where it did not name Schuetz as a defendant. The Court denied Wieland's motion for sanctions at the hearing on the parties' motions for summary judgment. (Doc. 113).

The record does not reveal similar evidence of Schuetz's actual authority with respect to the Mitel Service Order. Attorney Huber's email concerns only the consulting agreement between Wieland and CommSolvers. Similarly, Schuetz's report to Burian that he "got the CommSolvers contract approved" says nothing about the Mitel Service Order. Mitel instead relies on Schuetz's titles as "Network Operations Mgr - Wieland Digital Solutions," "IT - Director of Operations," "IT Operations Director – North America," "Director - IT Operations," and "Systems Administrator/Engineer" as evidence of his implied actual authority. But these titles show Schuetz's seniority within Wieland, they do not support his authority to sign contracts on its behalf. *See Curto*, 940 N.E.2d at 233 (even though wife admitted husband to nursing home as his "representative," she did not have actual authority to sign arbitration agreement on husband's behalf because evidence did not show husband "was present and directed" her to do so).

Mitel also cites Scholz's awareness and approval of Schuetz's work with Plaintiffs as evidence of actual authority. It is true that Schuetz's superiors knew that he was working with vendors and that Sam Gervich told Schuetz: "don't bring me problems, bring me solutions." But this evidence does not support Schuetz's actual authority to contractually bind Wieland to the Mitel Service Order. Actual authority requires evidence that Wieland "authorized, adopted, or acquiesced" in Schuetz signing the Mitel Service Order on its behalf. *Id.* at 234. At most, the record reveals vague approvals by Schuetz's superiors that he "keep plugging away" and that he should bring "solutions" not "problems" to his superiors. That does not mean Schuetz had actual authority to bind Wieland to the Mitel Service Order. Again, "[t]he principal's conduct is crucial to establish actual authority." *Id.* at 235. Here, the record does not reveal Wieland's express or implied approval of the Mitel Service Order.

There is a genuine issue of material fact as to whether Schuetz had actual authority to bind Wieland to the CommSolvers consulting agreement. The evidence does not support Schuetz's actual authority to bind Wieland to the Mitel Service Order.

2. *Apparent Authority*

"In the absence of actual authority, a principal can be bound by the acts of a purported agent when that person has apparent authority to act on behalf of the principal." *Curto*, 940 N.E.2d at 235 Under the doctrine of apparent authority, "a principal will be bound not only by the authority that it actually gives to another, but also by the authority that it appears to give." *Opp*, 231 F.3d at 1065 (quoting *Petrovich v. Share Health Plan of Ill., Inc.*, 719 N.E.2d 756, 765 (Ill. 1999)). "Apparent authority arises when a principal creates, by its words or conduct, the reasonable impression in a third party that the agent has the authority to perform a certain act on its behalf." *Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.*, 577 N.E.2d 1344, 1350 (Ill. App. Ct. 1991). But "[o]nly the words and conduct of the alleged principal, not the alleged agent, establish the authority of an agent." *C.A.M. Affiliates*, 715 N.E.2d at 783; *see also* Restatement (Third) of Agency § 2.03 cmt. c (2006) ("A belief that results solely from the statements or other conduct of the agent, unsupported by any manifestations traceable to the principal, does not create apparent authority unless . . . the agent's conduct has been directed by the principal.").

The doctrine of apparent authority "functions like an estoppel." *Petrovich*, 719 N.E.2d at 765. "A principal that places an agent in a situation where the agent may be presumed to have authority to act is estopped as against a third party from denying the agent's apparent authority." *Loncarevic & Assocs., Inc. v. Stanley Foam Corp.*, 72 N.E.3d 798, 807-08 (Ill. App. Ct. 2017) (quotation marks omitted). This also means that "[w]here parties silently stand by and

permit an agent to act on their behalf in dealing with another in a situation where the agent may be presumed to have authority, the parties are estopped from denying the agent's apparent authority as to third persons." *Mateyka v. Schroeder*, 504 N.E.2d 1289, 1295 (Ill. App. Ct. 1987).

State and federal courts in Illinois have repeatedly recognized the fact-sensitive nature of apparent authority in commercial settings. *Arris Grp.*, 192 N.E.3d at 99-100; *Loncarevic*, 72 N.E.3d at 806-07; *Mateyka*, 504 N.E.2d at 1294; *Hofner v. Glenn Ingram & Co.*, 489 N.E.2d 311, 316 (Ill. App. Ct. 1985); *Gondeck v. A Clear Title & Escrow Exch., LLC*, 47 F. Supp. 3d 729, 741 (N.D. Ill. 2014). What binds these cases together is a recognition that in a commercial negotiation, corporate representatives should be able to rely on each other's reasonable assertions of authority to bind the corporation they represent. *See e.g.*, *Loncarevic*, 72 N.E.3d at 807 (even though independent contractor exceeded his authority, third party reasonably relied on contractor's apparent authority when it executed his instructions).

Wieland argues that Plaintiffs failed to independently verify Schuetz's authority to bind it because they never communicated with anyone *other than Schuetz* about the contracts at issue. *See Malcak v. Westchester Park. Dist.*, 754 F.2d 239, 245 (7th Cir. 1985) ("A third party dealing with an agent has the obligation to verify both the fact and extent of the agent's authority."). Thus, Wieland insists that Plaintiffs' reliance on Schuetz's assertions of authority was not reasonable because Wieland, as the principal, never validated them. Once again, these arguments urge the Court to view the evidence in Wieland's favor and to depart from the well-accepted premise that "[t]he existence and scope of an agency relationship are questions of fact to be determined by the trier of fact unless the parties' relationship is so clear as to be undisputed." *Orix Credit Alliance, Inc. v. Taylor Mach. Works, Inc.*, 125 F.3d 468, 474

(7th Cir. 1997) (cleaned up); *accord Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 588 (7th Cir. 2021).

Before any contracts were signed, Scholz, Schuetz's supervisor, spoke with James McGarry about an "engagement" that "evolved into the Mitel Service Order." That conversation left McGarry with the impression that "this is a real project and a real opportunity for us to engage." A jury could interpret Scholz's discussion with McGarry as Scholz's stamp of approval for Schuetz to pursue the deal and to close it. Schuetz also signed the Mitel Service Order on December 31, 2020, with the notation: "To extend so Roman can review on or before Jan/8/21." Then, on January 8, 2021, Schuetz signed a second version of the Mitel Service Order without ancillary annotations, suggesting that "Roman" had reviewed and approved the contract. Again, the question is not which version of events is more believable. The question is whether there is evidence to support Plaintiffs' claim of Schuetz's apparent authority. *See Schoenberger v. Chicago Transit Auth.*, 405 N.E.2d 1076, 1081 (Ill. App. Ct. 1980) ("Whether a person has notice of the lack of an agent's authority or is put on notice by circumstances is a question of fact.").

Neither Scholz nor anyone else at Wieland ever informed Plaintiffs that final say over the contracts in question had to come from them and not Schuetz. Surely, Schuetz's supervisors would have been better positioned to know the scope of his authority than Mitel and CommSolvers. Indeed, Scholz could have explained the scope of Schuetz's authority to McGarry when he spoke with him before Schuetz signed the Mitel Service Order. He did not. And if Scholz did not think it was necessary to do so, then it certainly cannot be said, as a matter of law, that Mitel or CommSolvers should have independently known the limits of Schuetz's authority. That is a problem for Wieland because "[w]here an agent has apparent authority to act, the principal will be liable in spite of any undisclosed limitations the

principal has placed on that authority." *Lundberg v. Church Farm, Inc.*, 502 N.E.2d 806, 813 (Ill. App. Ct. 1986); *accord Progress Printing Corp. v. Jane Byrne Pol. Comm.*, 601 N.E.2d 1055, 1067 (Ill. App. Ct. 1992); *Mateyka*, 504 N.E.2d at 1295; *Gondeck*, 47 F. Supp. 3d at 741-42 (collecting cases).

Schuetz's assertions of authority were also not limited to the signatures he placed on the contracts at issue. He presented himself as Wieland's decisionmaker on all things concerning the Mitel Cloud Project, including Wieland's desire to cancel it shortly after the Mitel Service Order was signed. On January 18, 2021, Schuetz threatened to "issue a cancelation statement Friday to cancel the [Mitel] contract" if "Mitel cant [sic] figure out how to engage thru [sic] a vendor." One week later, Schuetz followed up with Burian to convey Wieland's preferred course of action as it pertained to the Mitel Service Order:

> [B]elow is what *we* want to do at this point . . . . Cancel the Mitel contract (30 day out clause with no questions asked) (because *we* are not going to start on that until after the networking upgrades and it needs to go through legal. I know this will change the price by a lot but *we* are ok with that). *Roman and I* feel better about doing the networking stuff first and not having this hanging out since it was rushed in the first place and I don't want my signature out there on it. Also it looks like a lot of pre-work will be between you and CMS as Mitel was not able to even pull the configs.

(emphases added). Schuetz's emails to Burian not only show a sense of dissatisfaction with Mitel, but they also suggest Schuetz's supervision of the entire project. A jury could reasonably view these emails as evidence of Schuetz's apparent authority because he is speaking on behalf of Wieland, not himself. And because the doctrine of apparent authority "functions like an estoppel" to protect third parties, *Petrovich*, 719 N.E.2d at 765, it will be up to a jury to determine whether CommSolvers should have known, at the time, that Schuetz improperly inflated his own authority.

Nor does it matter that some evidence might suggest Plaintiffs' doubts about Schuetz's authority. Wieland repeatedly emphasizes Rehkemper's text message to Sarah Watson about Keith Martin "shitting himself" when he was confronted with the Mitel Service Order. To Wieland, this evidence "demonstrates that Plaintiffs knew that Schuetz was acting far beyond the scope of his duties." Maybe, maybe not. What Rehkemper and Watson knew about Schuetz's authority is for a jury to decide. This argument, like several others, requires the Court to draw an inference in the movant's favor—something Rule 56 emphatically prohibits. *See Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (at summary judgment, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.") (internal quotation marks and alterations omitted).

Finally, it is well-settled that "[c]ircumstantial evidence may establish the fact and extent of an agency relationship." *Hofner*, 489 N.E.2d at 315. This is where evidence of industry practice is relevant. RJR's corporate representative Lisa Solecki testified that "in IT, we don't require a C-level person. . . . Procurement managers sign our contracts, IT sourcing managers sign our contracts, IT administrator managers and securities sign our contracts. We don't have C-level people signing our contracts." No one argues that Schuetz was a "C-level" employee at Wieland. But the fact that he was not and still signed two IT contracts on Wieland's behalf is entirely consistent with Solecki's description of accepted industry practices. Moreover, when CommSolvers and RJR arranged for Schuetz to speak with 8 x 8, no one at 8 x 8 "question[ed] whether Scott Schuetz had authority to negotiate a deal on behalf of Wieland." 8 x 8's lack of skepticism only supports Plaintiffs here because 8 x 8 was Mitel's competitor for Wieland's business and presumably evaluated Schuetz's authority by the same industry standards. And perhaps most importantly, the parties agree that it is "virtually

unheard of" for an employee to enter into an IT contract on his employer's behalf without proper authority to do so. "[A]n essential element [of apparent authority] is the third party's reasonable belief that the agent is acting within the authority granted by the principal, that the transaction appears to be regular and in the ordinary course of business." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 883-84 (7th Cir. 1992). Wieland effectively asks this Court to decide, as a matter of law, that when Plaintiffs discussed the Mitel Cloud Project with Schuetz, they should have been aware of something that is "virtually unheard of" in their industry. The evidence, viewed in the light most favorable to Plaintiffs, does not support such a finding. Thus, there is a genuine question of material fact as to whether Schuetz had apparent authority to bind Wieland to the contracts at issue.

Summary judgment must be denied as to Counts I and IV of CommSolvers' Amended Complaint and Counts I and III of Mitel's Amended Complaint.

### 3. *Ratification by Wieland*

Mitel also advances a separate argument in support of its contract claims: Wieland's ratification of the Mitel Service Order. Ratification is a separate and independent theory of agency liability, under which Wieland can be bound to the Mitel Service Order even if Schuetz was not authorized to do so. *Bilek*, 8 F.4th at 587. Mitel's contract claims do not require it to succeed on its ratification argument because the Court has already found that material questions of fact exist as to Schuetz's authority. This means that the issue of agency liability will proceed to trial, regardless of whether Mitel's ratification argument survives summary judgment. Nevertheless, it is appropriate to address ratification now because doing so helps narrow the issues for trial. *See* FED. R. CIV. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense--*or the part of each claim or defense*--on which

summary judgment is sought.") (emphasis added); *accord BBL, Inc. v. City of Angola*, 809 F.3d

317, 325 (7th Cir. 2015).

"Ratification is the equivalent of authorization, but it occurs after the fact, when a

principal gains knowledge of an unauthorized transaction but then retains the benefits or

otherwise takes a position inconsistent with nonaffirmation." *Progress Printing*, 601 N.E.2d at

1067. The evidence demonstrates that Wieland moved swiftly to repudiate the contracts after

Schuetz stopped communicating with Plaintiffs. On July 14, 2021, Tricia Rehkemper sent an

email to Keith Martin to "introduce" herself because Schuetz had gone on leave and the Mitel

Cloud Project was not progressing. Martin informed Rehkemper that "Wieland does not have

any new system implementations in process at this time." Watson then sent Martin the signed

Mitel Service Order, dated December 31, 2020, and explained that she was Wieland's "Mitel

representative and lead Manufacturer contact on this engagement."

Two days later, on July 16, 2021, Wieland terminated Schuetz. On July 23, 2025,

Plaintiffs spoke on the phone with Wieland's corporate leadership including Keith Martin,

Roman Scholz, Mark Fowler, Joseph Stutz, and Ashley Huber. On this call, Wieland

repudiated the contracts with CommSolvers and Mitel.

Mitel cites one evidentiary item in support of ratification: Attorney Huber's May 11,

2021 email. That email, as explained, may be competent evidence of Schuetz's express actual

authority to bind Wieland to the consulting agreement with CommSolvers. But it does not

support ratification because it does not mention the Mitel Service Order at all. Mitel's

argument stretches the ratification principle beyond its reach because it seeks to use

Wieland's approval of a different contract as evidence of ratification of *its* contract with

Wieland. That is a bridge too far. The evidence thus does not support Mitel's ratification

claim.

      B.   <u>Mitel's Declaratory Judgment Claim</u>

In Count II of its Amended Complaint, Mitel asserts a claim for declaratory judgment. This claim alleges that "[a]n actual, present, and justiciable controversy has . . . arisen among Wieland and Mitel concerning the validity and enforceability of the [Mitel] Service Order and Schuetz's authority to execute the [Mitel] Service Order on behalf of Wieland." Mitel Am. Compl. ¶ 63 (Doc. 32). This claim seeks judgment on the substantive issues that the Court already addressed—Schuetz's authority to bind Wieland to the Mitel Service Order and Wieland's subsequent ratification of it. Mitel's breach of contract and declaratory judgment claims thus present overlapping legal issues and are substantively duplicative.

In this situation, the Court may decline to hear a declaratory judgment action because resolution of the underlying substantive claim resolves the issues raised in the declaratory judgment claim. *Cohn v. Guaranteed Rate, Inc.*, 130 F. Supp. 3d 1198, 1205 (N.D. Ill. 2015). That is the appropriate course of action here because it makes little sense to entertain two substantively identical claims when the resolution of one resolves the other. Count I of Mitel's Amended Complaint advances a breach of contract claim against Wieland. Mitel alleges that Schuetz agreed to the Mitel Service Order on Wieland's behalf and that he had actual and apparent authority to do so. Separately, Mitel contends that Wieland ratified the Mitel Service Order after it became aware of what Schuetz had done. These are the exact issues that the Court addressed above. Thus, in its discretion, the Court finds that it is appropriate to decline to hear Mitel's declaratory judgment claim.

Beyond that, Mitel's response to Wieland's motion for summary judgment raises no argument in defense of its declaratory judgment claim (other than the substantive arguments

it advanced in support of its contract-based claims). It has thus waived its declaratory judgment claim. *See Vitug v. Multistate Tax Comm'n*, 860 F. Supp. 546, 552 n.5 (N.D. Ill. 1994) (plaintiff conceded issue raised in defendant's summary judgment motion by not responding to it). Accordingly, the Court grants Wieland's motion for summary judgment as to Count II of Mitel's Amended Complaint.

      C.  Plaintiffs' Quasi-Contract Claims

      Wieland's second argument is that Plaintiffs' quasi-contract claims for unjust enrichment and quantum meruit are fatally defective because Wieland never received anything of value from either Plaintiff. "Both quantum meruit and unjust enrichment are quasi-contractual legal theories based on a contract implied by law."[3] *Council for Jewish Elderly v. Kurtz*, 2024 IL App (1st) 230102, ¶ 42, --- N.E.3d ----, ---- (Ill. App. Ct. 2024). The Illinois Appellate Court explained the relevant legal principles for a quasi-contract claim as follows:

> A contract implied in law, or a quasi contract, is not a contract at all. Rather, it is grounded in an implied promise by the recipient of services or goods to pay for something of value which it has received. A contract implied in law is one in which no actual agreement exists between the parties, but a duty to pay a reasonable value is imposed upon the recipient of services or goods to prevent an unjust enrichment. The essence of a cause of action based upon a contract implied in law is the defendant's failure to make equitable payment for a benefit that it voluntarily accepted from the plaintiff. No claim of a contract implied in law can be asserted when an express contract or a contract implied in fact exists between the parties and concerns the same subject matter. In order to state a claim based upon a contract implied in law, a plaintiff must allege specific facts in support of the conclusion that it conferred a benefit upon the defendant which the defendant has unjustly retained in violation of fundamental principles of equity and good conscience. Stated otherwise, to be entitled to a remedy based upon a contract implied in law, a plaintiff must show that it has furnished valuable services or goods which the defendant received under circumstances that would make it unjust to retain without

---

[3] Plaintiffs are limited in their recovery to either their contract claims or quasi-contract claims. These theories serve as alternative bases for relief. "[Q]uantum meruit and breach of contract are often pleaded in the alternative so that the plaintiff may recover even if the contract is unenforceable." *Bl3, Inc. v. Hamor*, No. 08 CV 2384, 2011 WL 1231156, at *9 (N.D. Ill. Mar. 30, 2011) (internal quotation marks omitted).

paying a reasonable value therefore.

*Karen Stavins Enterpr., Inc. v. Comm. Coll. Dist. No. 508*, 36 N.E.3d 1015, 1018 (Ill. App. Ct. 2015)
(internal citations omitted).

    As a threshold matter, the Court questions Plaintiffs' ability to bring an unjust
enrichment claim as a stand-alone cause of action. The Seventh Circuit has explained that
"[u]njust enrichment is not a separate cause of action under Illinois law." *Horist v. Sudler
& Co.*, 941 F.3d 274, 281 (7th Cir. 2019). Illinois courts routinely address unjust enrichment
and quantum meruit claims together and not as separate causes of action. *See e.g.*, *Cove Mgmt*,
986 N.E.2d at 1215; *Stark Excavating, Inc. v. Carter Const. Srvcs, Inc.*, 967 N.E.2d 465, 474 (Ill.
App. Ct. 2012) (discussing unjust enrichment and quantum meruit claims together but
recognizing distinctive measures of damages); *BI3, Inc. v. Hamor*, No. 08 CV 2384, 2011 WL
1231156, at *9 (N.D. Ill. Mar. 30, 2011) (similar). This bundled approach is not surprising
because "[t]he term 'unjust enrichment' is not descriptive of conduct that, standing alone,
will justify an action for recovery." *Alliance Acceptance Co. v. Yale Ins. Agency*, 648 N.E.2d 971,
977 (Ill. App. Ct. 1995) (quoting *Charles Hester Enterpr., Inc. v. Ill. Founders Ins. Co.*, 484 N.E.2d
349, 354 (Ill. App. Ct. 1985)). Rather, "[q]uantum meruit is used as an equitable remedy to
provide restitution for unjust enrichment." *Cove Mgmt*, 986 N.E.2d at 1215. Unjust enrichment
thus refers to a "condition" that is either caused by a defendant's wrongful or unlawful
conduct or is based on a quasi-contract. *Gagnon v. Schickel*, 983 N.E.2d 1044, 1052 (Ill. App.
Ct. 2012) (internal quotation marks and citation omitted). With these considerations in mind,
the Court will address CommSolvers' and Mitel's claims of unjust enrichment as part of their
quasi-contractual claims for quantum meruit recovery, not as stand-alone causes of action.

    Wieland contends that Mitel only spent $30,000 to set up a telephone extension

program that was never delivered. As to CommSolvers, Wieland argues that it never received cheaper telecommunications services, and thus received nothing of value from CommSolvers. In its own words, Wieland received no "goods or services" from either CommSolvers or Mitel.

Wieland presents a binary view of the value that Plaintiffs supplied: it either received a new cloud-based telecommunications system, or it did not. If it did not, then according to Wieland, it received *no benefit* that can support quantum meruit recovery. The Court disagrees. Both Plaintiffs have offered competent evidence that they spent several months and many hours designing and producing a cloud-based telecommunications system for Wieland and advising Wieland in the process. CommSolvers insists that it provided "consulting services to Wieland over the course of more than one year" and devoted at least one million dollars to the project, which was an "all hands on deck" effort. Mitel acknowledges that "not a single seat was set up, not a single instance was activated, not a single phone was delivered. Not one moment of time did Wieland ever use Mitel Cloud Services." But Mitel invested its resources to "develop[] a system for the use of a seven-digit phone extension system, which is atypical and was bespoke particularly for Wieland." Mitel also spent around $30,000 on "implementation" of Wieland's new cloud-based technology. And Wieland itself admits that Mitel "had done some internal work . . . to prepare for implementation."

There can be little doubt that Plaintiffs devoted their time, resources, and subject matter expertise to the Mitel Cloud Project for Wieland's benefit. If a jury decides that Plaintiffs' written contracts with Wieland are invalid because Schuetz was not authorized to bind Wieland, they may still decide to award damages under a quasi-contract theory based

on these efforts. *See Restore Constr. Co. v. Bd. of Educ. of Proviso Township High Schools Dist. 209*, 133 N.E.3d 71, 84 (Ill. App. Ct. 2019) (quantum meruit "is predicated on the reasonable value of the services performed") (internal quotation marks omitted); *Stark Excavating*, 967 N.E.2d at 474 (plaintiff's expenditure of time and money to complete construction project supported quasi-contract claim); *Galaxy Env., Inc. v. Antoniou*, 2017 IL App (1st) 160321-U, ¶ 32 (Ill. App. Ct. 2017) (consulting services recoverable in quantum meruit).

For these reasons, summary judgment in favor of Wieland is appropriate as to Count II of CommSolvers' Amended Complaint and Count IV of Mitel's Amended Complaint (the unjust enrichment claims). Summary judgment is not warranted as to Count III of CommSolvers' Amended Complaint and Count V of Mitel's Amended Complaint (the quantum meruit claims).

### D. Plaintiffs' Damages

Wieland's third and final line of argument concerns Plaintiffs' damages. As to CommSolvers, Wieland claims that it lacks evidence of "non-speculative damages," and that this evidentiary hole is fatal to its claims. As to Mitel, Wieland argues that its commission payments to employees are not recoverable because Mitel failed to mitigate its damages by not clawing these payments back.

#### 1. *CommSolvers' Damages*

Under Illinois law, a plaintiff in a breach of contract action must demonstrate "an actual loss or measurable damages resulting from the breach." *Avery v. State Farm Mut. Auto Ins. Co.*, 835 N.E.2d 801, 832 (Ill. 2005). This means that the plaintiff must offer "a reasonable basis for computing damages." *Snelson v. Kamm*, 787 N.E.2d 796, 814 (Ill. 2003) (quoting *Gill v. Foster*, 626 N.E.2d 190, 194 (Ill. 1993)). "Absolute certainty about the amount of damage is

not necessary" although "damages may not be predicated on mere speculation, hypothesis, conjecture or whim." *Anderson v. Nelsen*, 227 N.E.3d 855, 874 (Ill. App. Ct. 2023) (internal quotation marks omitted). "The proper measure of damages is the amount necessary to place the nonbreaching party into the position it would have been in had the defendant properly performed." *Ivey v. Transunion Rental Screening Solutions, Inc.*, 186 N.E.3d 1076, 1085 (Ill. App. Ct. 2021), *aff'd*, 215 N.E.3d 871 (Ill. 2022).

The CommSolvers consulting agreement called for Wieland to pay CommSolvers "25% of the difference between initial/current pricing and negotiated pricing on services, equipment, etc." This provision is based on "savings" that CommSolvers' "negotiated pricing" achieved for Wieland. Wieland seizes on CommSolvers' testimony that it would be "completely speculating what [Wieland's] spend was" for its existing telecommunications services. Thus, Wieland contends, there is no "baseline number" against which CommSolvers could calculate the disparity between current and proposed pricing under the consulting agreement. And without a baseline number, CommSolvers would be unable to establish its damages with the required level of certainty to survive summary judgment.

But Wieland's argument overlooks the evidence that *does* establish a baseline from which its savings can be calculated. Scott Peterson, Mitel's former Chief Revenue Officer, testified that Wieland's savings would be "at least 20 to 30 percent, you know, per user per month." Art Schuetz testified that Wieland's "base rate" was "16,000 times $29 a month" based on Wieland's 16,000 "seats."[4] And based on these numbers, CommSolvers estimates

---

[4] The Court takes no position on the admissibility of Art's testimony at this time because Wieland has not challenged it. This does not mean that Wieland has waived its ability to contest admissibility because "[i]f the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial." FED. R. CIV. P. 56(c)(2), advisory committee's note to 2010 amendment.

that Wieland's savings over the 36 month-term of the Mitel Service Order would be $7,488,000, which would entitle CommSolvers to $1,872,000 (25% of Wieland's estimated savings). The CommSolvers consulting agreement provided a formula to calculate Wieland's damages. Witness testimony can solve for the formula's variables and generate a damages figure. Whether a jury believes Art and Scott Peterson is not relevant at this stage. What matters is that CommSolvers has competent evidence to prove its damages with "reasonable certainty." *Ivey*, 186 N.E.3d at 1085; *see also 1472 N. Milwaukee, Ltd. v. Feinerman*, 996 N.E.2d 652, 662-63 (Ill. App. Ct. 2013) (damages award does not require documentary evidence and may be based on witness testimony).

Wieland's reliance on *Ivey*, 186 N.E.3d at 1085, for the proposition that "[a] plaintiff's failure to prove damages entitles the defendant to judgment as a matter of law" is unconvincing. In *Ivey*, a company called Helix Solutions LLC and its founder Roger Ivey entered into a nonexclusive marketing agreement with Transunion Rental Screening Solutions ("TRUSS") whereby TRUSS would create a new platform to market and sell customizable lease forms that Ivey would create. *Id.* at 1080-81. TRUSS never got the platform off the ground and after years of delay, Helix and Ivey filed suit. *Id.* at 1082. The plaintiffs submitted two expert reports to support their claim of over $100,000,000 in damages, which reflected their expected revenue from the arrangement with TRUSS. *Id.* at 1083-84. The trial court granted summary judgment in favor of TRUSS because it found the plaintiffs' damages "too speculative" under Illinois' "New Business Rule." *Id.* at 1084.

The new business rule, as its name suggests, "precludes expert witnesses from speculating about [a new business's] lost profits" where the business has no track record of such profits. *Id.* at 1085. The Appellate Court (and later the Illinois Supreme Court) affirmed

the trial court's application of the new business rule because the experts' analysis of Helix's expected performance was improperly based on a similarly situated company's performance from which Helix had actively sought to distinguish itself. *Id.* at 1087. The experts' damages calculations were thus based on an unfounded comparison to another business and unduly speculative. *Id.*

Wieland has not argued that the new business rule applies to CommSolvers' damages in this case. Nor could it. Nothing in the record suggests that CommSolvers is a newcomer to the world of telecommunications consulting. And as noted, CommSolvers set forth a mathematical formula from which its damages can be calculated. Scott Peterson and Art Schuetz offered testimony with which that formula can produce a numerical result. It will be up to a jury to accept or reject their testimony. This damages theory is entirely consistent with *Ivey*, which recognized that "absolute certainty is not required" to prove damages; what is needed is "reasonable certainty without resort to conjecture or speculation." *Id.* at 1085.

Wieland's second damages argument can be disposed of more simply. It contends that CommSolvers' only documented out-of-pocket expenses consist of "less than $10,000," which it paid to Art Schuetz. But the CommSolvers consulting agreement explicitly called for CommSolvers to be paid for "Time and Material/Hourly Fees." CommSolvers has proffered evidence that it invested over one million dollars in an "all hands on deck" effort to facilitate the Mitel Cloud Project. Wieland's argument that CommSolvers lacks a "documentary record of any alleged losses," and is thus unable to establish its damages, is misplaced. Documentary evidence is not required to prove damages in Illinois; it is enough that CommSolvers can present testimony from knowledgeable witnesses who can support its claimed of out-of-pocket expenses. *Feinerman*, 996 N.E.2d at 662-63.

For these reasons, summary judgment is not warranted as to the issue of CommSolvers' damages.

2. *Mitel's Commission Payments*

Wieland's final argument targets Mitel's commission payments to its employees. Mitel paid its sales staff approximately $250,000 for closing the Mitel Service Order. Mitel admitted that it has not sought to "claw back" these payments even though it could have done so pursuant to a standard corporate practice. Its failure to "right size" these payments, according to Wieland, amounts to a failure to mitigate.

Aside from citing a case from the Illinois Appellate Court for the apodictic proposition that the "there can be no recovery for damages that might have been avoided by a reasonable effort on the part of the person injured," *Mayster v. Santacruz*, 163 N.E.3d 246, 254-55 (Ill. App. Ct. 2020), Wieland has identified no authority that supports a claw-back like the one it seeks to impose on Mitel. A common example of a failure to mitigate arises in the employment context where an allegedly wrongfully discharged employee does not seek to find new employment and instead "let[s] [her] damages mount." *Publishers Resource, Inc. v. Walker-Davis Publications, Inc.*, 762 F.2d 557, 560 (7th Cir. 1985). In that situation, the employee's failure to try to find another job would constitute a violation of her duty to mitigate. *Id.* This situation is not comparable because Mitel paid its employees based on its good faith belief that Wieland would perform under the Mitel Service Order. Mitel's response also correctly points out that the need for these claw-backs is entirely dependent on the outcome of this lawsuit. If a settlement results in a recovery for Mitel or a jury returns a verdict in its favor, there could be no serious argument that a claw-back would not be warranted.

Thus, summary judgment is not appropriate as to Mitel's commission payments to its

employees based on its failure to mitigate damages.

## II.    CommSolvers' Motion for Summary Judgment

CommSolvers moves for summary judgment on Wieland's only remaining counterclaim: violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et seq*. The CFAA "subjects to criminal liability anyone who 'intentionally accesses a computer without authorization or exceeds authorized access,' and thereby obtains computer information." *Van Buren v. United States*, 593 U.S. 374, 379 (2021) (quoting 18 U.S.C. § 1030(a)(2)). The statute was passed as a protective measure in the 1980s "as the public and private sectors harnessed the power of computing for improvement and innovation, [and] so-called hackers hatched ways to coopt computers for illegal ends." *Id.* at 378. Thus, "[t]he general purpose of the CFAA was to create a cause of action against computer hackers (*e.g.*, electronic trespassers)." *Shamrock Foods Co. v. Gast*, 535 F. Supp. 2d 962, 965 (D. Ariz. 2008) (internal quotation marks omitted). Although initially conceived as a criminal statute, the CFAA now "provides for a private right of action for anyone that has suffered damage or loss of at least $5,000" as a result of a violation. *ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 262 (N.D. Ill 2020); *Dresser-Rand Co. v. Jones*, 957 F. Supp. 2d 610, 613 (E.D. Pa. 2013).

Wieland relies on subsections 1030(a)(4) and (a)(5)(C) of the CFAA as the legal bases for CommSolvers' liability. Subject to certain damages limitations, subsection (a)(4) imposes liability on anyone who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value." 18 U.S.C. § 1030(a)(4). Subsection (a)(5)(C) applies to anyone who "intentionally accesses a protected computer without

authorization, and as a result of such conduct, causes damage and loss." *Id.* § 1030(a)(5)(C). Both provisions share the requirement that the wrongdoer "accesses" a protected computer.[5] The CFAA does not define the word "accesses" (or its infinitive "to access").

Although the meaning of the phrase "to access" may appear obvious, it demands a bit more attention in light of the evidence presented here. The word "accesses" in subsections 1030(a)(4) and (a)(5)(C) is used as a verb, *i.e.*, something that someone does. *Dresser-Rand*, 957 F. Supp. 2d at 614-15. This much is apparent, especially where subsection (a)(5)(C) uses the word "conduct" to refer back to the wrongdoer who "intentionally accesses a protected computer without authorization." To "access" something means "to get at" or "gain access to." Access (transitive verb), *Merriam-Webster's Unabridged Dictionary*, available at https://unabridged.merriam-webster.com/unabridged/access (last visited Mar. 7, 2025). "Access" as a noun means "permission, liberty, or ability to enter, approach, communicate with, or pass to and from." Access (noun), *Id.* To "access" a computer can, of course, mean more than one thing: for instance, it can mean typing in a password to reach a home screen, opening and viewing files, or even disassembling the device itself to access its hardware.

One conceptual approach to solving the "access" riddle under the CFAA is to focus on the alleged wrongdoer's interaction with the computer:

> If we focus on how computers operate, we can interpret access by looking to whether a user has sent communications that have physically entered the computer. For example, one standard could be that a user accesses a computer when she sends a command to that computer instructing the computer to perform a task, and the computer performs the request as instructed. Another standard could be that a user accesses a computer when the user sends a command requesting information in return and the computer responds by

---

[5] Subsection 1030(a)(4) also assigns liability to those who "exceed[] authorized access." But anyone who "exceeds authorized access" to a protected computer has already completed the affirmative act of "accessing" the computer. *See Van Buren*, 593 U.S. at 382.

sending back information to the user. In this sense, *accessing a computer is no different from simply using a computer.*

Orin S. Kerr, *Cybercrime's Scope: Interpreting "Access" and "Authorization" in Computer Misuse Statutes*, 78 N.Y.U. L. REV. 1596, 1620-21 (2003) (emphasis added). The focus on "use" aligns with subsection (a)(4), which precludes liability where "the object of the fraud and the thing obtained consists only of the *use* of the computer and the value of such *use* is not more than $5,000 in any 1-year period." 18 U.S.C. § 1030(a)(4) (emphases added). Of course, "use" is not synonymous with "access" under the CFAA. But both words contemplate some affirmative step by the defendant—*i.e.*, an "interaction" between the defendant and the computer. *Dresser-Rand*, 957 F. Supp. 2d at 615. For present purposes, it is enough to recognize that one who "accesses" a protected computer under the CFAA gains access to its electronically stored contents by way of an affirmative act. Or stated more plainly, the defendant has to do something with the computer before CFAA liability attaches. *See United States v. Nosal*, 930 F. Supp. 2d 1051, 1063 (N.D. Cal. 2013) ("The common definition of the word "access" encompasses not only the moment of entry, but also the ongoing use of a computer system."); *compare Dresser-Rand*, 957 F. Supp. 2d at 615 (defendant did not "access" protected computer where he had no direct "interaction" with it and only viewed contents from protected computer on his own device after they were sent to him); *with ExactLogix*, 508 F. Supp. 3d at 260 n.2 (access undisputed where third party used defendant's login credentials to gain entry to plaintiff's software).

Schuetz's provision of a Wieland-owned laptop and VPN to CommSolvers is critical here. It is undisputed that Schuetz provided these items to CommSolvers. CommSolvers insists that it "never logged in to and never accessed the laptop computer or Wieland's

network at any time." Wieland maintains that "if Schuetz had provided his own VPN log in information to CommSolvers, Wieland would not be able to discern whether CommSolvers used it or not." But while Wieland's suspicion of CommSolvers may be understandable, it is undisputed that Wieland examined its network and found "no breaches of security by CommSolvers or Mitel and no damage to Wieland's computer systems."

The problem for Wieland is that it has offered no evidence of an affirmative act by CommSolvers to gain access to either its laptop or its VPN. The only responsive evidence in the record on this question is Burian's affidavit, which declares that "at no time did CommSolvers plug in, boot up, or use the Wieland laptop. CommSolvers did not access any information on the Wieland laptop, nor did CommSolvers ever access Wieland's network, whether via the Wieland laptop or otherwise." Wieland responds with a rhetorical question: "Why did CommSolvers have possession of Wieland's laptop and VPN credentials for two months if not to access Wieland's network illegally and secretly?" Of course, it is not out of the realm of possibility that Burian's affidavit is untruthful and that CommSolvers did in fact access Wieland's network. But Wieland has offered no evidence, testimonial or otherwise, that would support this claim.

It is well-settled that "the non-moving party must present more than just bare allegations to survive summary judgment. The non-moving party must present evidence on which the jury could reasonably find for the nonmoving party." *Simpson v. Office of Chief Judge of Circuit Ct. of Will Cnty*, 559 F.3d 706, 712 (7th Cir. 2009) (cleaned up). Here, the record simply does not reveal any evidence that CommSolvers ever "accessed" Wieland's laptop or its VPN. This evidentiary gap is particularly apparent where Wieland's own examination of its systems turned up no "no breaches of security by CommSolvers or Mitel and no damage to

Wieland's computer systems."

Having access to something is not the same as accessing it. The former refers to a permission (or at least the capacity) to do something; the latter refers, at a minimum, to the act of gaining entry. The CFAA does not cover the former, only the latter. *Dresser-Rand*, 957 F. Supp. 2d at 615.

CONCLUSION

For these reasons, Wieland's motion for summary judgment (Doc. 77) is **GRANTED in part** and **DENIED in part**. Count II of CommSovlers' Amended Complaint (Doc. 31) is dismissed with prejudice. Counts II and IV of Mitel's Amended Complaint (Doc. 32) are dismissed with prejudice. CommSolvers' motion for summary judgment (Doc. 79) is **GRANTED**. Count II of Wieland's Counterclaim (Doc. 45) is dismissed with prejudice.

The following claims will proceed to trial: CommSolvers' claims against Wieland for breach of contract (Count I), quantum meruit (Count III), and promissory estoppel (Count IV); and Mitel's claims against Wieland for breach of contract (Count I), promissory estoppel (Count III), and quantum meruit (Count V).

**IT IS SO ORDERED.**

**DATED: March 12, 2025**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**